AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
4/27/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___vam___ DEPUTY

| United States of America | |
|---|---|
| v. | Case No. 2:22-mj-01659 -DUTY |
| RICHARD NEIDER IDROBO-DUQUE, | |
| Defendant. | |

FILED
CLERK, U.S. DISTRICT COURT
APRIL 27, 2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___AF___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of April 21, 2022, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2119 | Stowaway on Aircraft |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Carlos A. Llamas
Complainant's signature

Carlos A. Llamas, FBI Task Force Officer
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: April 27, 2022

Judge's signature

City and state: Los Angeles, California

Hon. Alka Sagar, U.S. Magistrate Judge
Printed name and title

AUSA: Julia Hu (x3802)

**AFFIDAVIT**

I, Carlos A. Llamas, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against RICHARD NEIDER IDROBO-DUQUE ("IDROBO-DUQUE") for a violation of Title 18, United States Code, Section 2199 (Stowaway on Aircraft).

2. This affidavit is also made in support of an application for a warrant to search a black and blue Huawei Model JKM-LX3 (the "SUBJECT DEVICE"), as described more fully in Attachment A, for evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 2199 (Stowaway on Aircraft) (the "Subject Offense"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of the investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates are approximate.

## II. BACKGROUND OF AFFIANT

4.    I am a Task Force Officer ("TFO") assigned to the Federal Bureau of Investigation ("FBI") and have been so for approximately five years.  Since 2017, I have been assigned to the Los Angeles International Airport ("LAX") Office of the FBI, where I investigate violations of federal law which occur within the airport environment and onboard aircraft.

5.    My training and experience include 25 years as a law enforcement officer with the Los Angeles Police Department ("LAPD") and I am Federally Deputized with the FBI.  During the course of my employment with LAPD, I have been assigned to patrol duties as well as detective duties where I have investigated hundreds of crimes, including but not limited to: murders, attempted murders, assaults with deadly weapons, robberies, burglaries, gang related crimes, terrorist related crimes, and stowaways, among other crimes.  My experience also includes interviewing victims, suspects, and witnesses along with preparation and execution of search warrants and criminal complaints.

## III. SUMMARY OF PROBABLE CAUSE

6.    On April 21, 2022, IDROBO-DUQUE snuck onto Avianca Airlines Flight No. 84 from Bogota, Columbia to Los Angeles, California without a ticket or boarding pass for the flight.  After arriving at LAX that evening, IDROBO-DUQUE presented himself and his Colombian passport to a U.S. Customs and Border Protection ("CBP") Officer.  IDROBO-DUQUE's passport did not have a U.S. Visa.

7.  IDROBO-DUQUE was not admitted to the United States. Instead, CBP sent IDROBO-DUQUE to their Admissibility Review Unit ("ARU") for further review of his admissibility to the United States. Records checks show that IDROBO-DUQUE had made three previous applications for visas to the United States, which were denied.

8.  During a post-Miranda FBI interview on April 26, 2022, IDROBO-DUQUE admitted to knowingly boarding Avianca Airlines Flight No. 84 from Bogota, Colombia to Los Angeles, California on April 21, 2022, without being a ticketed passenger on that flight and without a U.S. visa.

9.  During a consent search on April 26, 2022, of the backpack that IDROBO-DUQUE had brought with him on the Avianca flight, agents found the SUBJECT DEVICE. The SUBJECT DEVICE is currently in FBI custody in Los Angeles, California.

## IV. **STATEMENT OF PROBABLE CAUSE**

10. Based on my review of law enforcement reports, surveillance video recordings, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

   **A.   IDROBO-DUQUE Snuck onto an Avianca Airlines Flight from Bogota, Colombia to LAX**

8.  According to statements from an Avianca Airlines employee, security footage at the El Dorado International Airport in Bogotá, Colombia from April 21, 2022, shows the following:

3

      a.    On April 21, 2022, a man later identified as IDROBO-DUQUE presented himself to immigration services in the Bogotá Airport.

      b.    IDROBO-DUQUE went through airport security and eventually made his way to Gate 49, where Avianca Airlines Flight No. 84 to LAX was boarding.

      c.    While airline personnel were processing other passengers, IDROBO-DUQUE crossed the barrier at Gate 49 and walked onto the aircraft that was heading to LAX.

11.    Avianca Airlines records show that 242 passengers scanned their boarding passes to board Flight No. 84 on April 21, 2022, and there were eight empty seats.

12.    Based on my knowledge, training, and experience, as well as information related to me by other agents, I know that federal aviation regulations require a passenger to present valid country entry documents to match a valid boarding pass in order to fly to the United States.  A valid boarding pass can either be in paper or digital form, or both.

**B.    IDROBO-DUQUE Landed at LAX and Presented Himself to Immigration Authorities**

13.    According to United States Customs and Border Protection ("CBP") records, Avianca Airlines Flight No. 84 landed at LAX at approximately 6:50 p.m. on April 21, 2022. IDROBO-DUQUE is not listed as a passenger on the manifest of passengers that CBP received from Avianca Airlines for Flight No. 84 on April 21, 2022.

14. According to CBP reports and my conversations with CBP officers at LAX, in the evening of April 21, 2022, a man later identified as IDROBO-DUQUE presented himself to a CBP Passport Control Primary Officer at LAX and the following transpired:

    a. IDROBO-DUQUE presented the CBP Officer a Colombian passport in his name. IDROBO-DUQUE did not have a U.S. visa in his passport.

    b. The CBP Officer detained IDROBO-DUQUE based on his answers to the officer's questions, and he was taken to the CBP Admissibility Review Unit area of LAX for further review of his admissibility to the United States.

15. CBP officers attempted to move IDROBO-DUQUE from the CBP Admissibility Review Unit area at LAX to a holding facility in downtown Los Angeles, but that holding facility was full. IDROBO-DUQUE therefore spent several days at LAX in the CBP Admissibility Review Unit area while his admissibility status was reviewed.

    **C. IDROBO-DUQUE Admitted Sneaking onto the Flight to LAX**

16. On April 26, 2022, FBI Special Agents Vanessa Tinajero and I interviewed IDROBO-DUQUE at an interview room in CBP's space at LAX. Both Special Agent Tinajero and I are fluent in Spanish.

17. Before beginning the interview, we read IDROBO-DUQUE his <u>Miranda</u> rights in Spanish. IDROBO-DUQUE waived his <u>Miranda</u> rights. IDROBO-DUQUE stated, among other things, the following:

    a. IDROBO-DUQUE was originally from Colombia but holds a dual citizenship with Chile. He has been residing in

Chile, on and off, for several years. Prior to April 21, 2022, IDROBO-DUQUE had been in Bogota, Colombia for approximately 15 days visiting family members.

      b.   On April 21, 2022, IDROBO-DUQUE had an airline ticket for Sky Airlines flight 701. Flight 701 was scheduled to depart Bogota, Colombia and arrive in Santiago, Chile that same day. I know from online searches that Sky Airlines is a low-cost airline based in Santiago, Chile that provides service mainly to Chile and several South American locations.

      c.   After checking in for his flight to Chile and using his Sky Airlines ticket to access the secure area of the Bogota airport, IDROBO-DUQUE noticed Avianca Airlines Flight No. 84 in the process of boarding to Los Angeles, California.

      d.   At that point, IDROBO-DUQUE decided not to get on his flight to Chile, but instead took a chance to sneak on the Avianca Airlines flight to LAX.

      e.   To carry out his plan, IDROBO-DUQUE waited for all the passengers to board the Avianca flight. He waited for security and airline staff to be distracted so he could board the Avianca flight without being checked.

      f.   IDROBO-DUQUE evaded security and airline staff and boarded the Avianca flight undetected.

      g.   Once onboard the aircraft, IDROBO-DUQUE blended in with ticketed passengers and chose an unoccupied seat, which he described as a middle seat in the middle section.

      h.   IDROBO-DUQUE recalled that Avianca Airlines Flight No. 84 landed at LAX at approximately 6:20 p.m. Once he

was in the international arrival inspection area, IDROBO-DUQUE walked to a CBP Officer and showed his Colombian passport.

   i. IDROBO-DUQUE acknowledged he did not have a U.S. Visa.  IDROBO-DUQUE said that he knew he could not be admitted in the U.S. without a visa, but he was hoping he could claim asylum.

  **D.** **IDROBO-DUQUE Possessed the SUBJECT DEVICE in His Carry-On Backpack**

 18. Following his <u>Mirandized</u> interview with me and FBI Special Agent Vanessa Tinajero on April 26, 2022, IDROBO-DUQUE consented to a search of a backpack that he had brought onto Avianca Airlines Flight No. 84.  In the backpack, agents found the SUBJECT DEVICE, as well as a boarding pass for Sky Airlines 701 from Bogota, Colombia to Santiago, Chile for April 21, 2022, and a boarding pass from Chile to Bogota from a few weeks prior.

 19. Based on my knowledge, training, and experience, as well as information related to me by other agents, I know that airlines communicate primarily with passengers by electronic communication.  Many people buy airline tickets online and use digital devices, like the SUBJECT DEVICE, to do so.  Furthermore, most people provide an email address to airlines when they buy a ticket.  Tickets and boarding passes are often issued electronically to passengers, which passengers may access on their digital devices, such as the SUBJECT DEVICE.

 20. Based on my knowledge, training, and experience, as well as information related to me by other agents, I know that passengers often use their digital devices, such as the SUBJECT

7

DEVICE, when traveling to receive alerts and notifications from airlines, check in for their flights, look up information about their flights, monitor the status of their flights and to check for delays, look up directions to and from the airport, arrange for transportation to and from the airport, communicate with associates about their travel status and plans, and to take pictures.

21. Based on my knowledge, training, and experience, as well as information related to me by other agents, I know that digital devices like the SUBJECT DEVICE may also track the user's Global Positioning System ("GPS") coordinates, which may show the user's location and travel history.

E. **IDROBO-DUQUE's Immigration History**

22. On April 26, 2022, FBI Supervisory Special Agent David Gates checked the U.S. State Department's visa database and determined that IDROBO-DUQUE applied for three U.S. visas in 2015, 2018, and 2019. All three visa applications were refused by the U.S. State Department.

V. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

23. As used herein, the term "digital device" includes the SUBJECT DEVICE.

24. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have

been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain

software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

  25. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

   a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

   b. Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

  26. The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

which I know from my training, experience, and review of publicly available materials:

      a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

      c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress IDROBO-DUQUE's thumb- and/or fingers on

11

the device(s); and (2) hold the device(s) in front of IDROBO-DUQUE's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

27. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. CONCLUSION

28. For all of the reasons described above, there is probable cause to believe that IDROBO-DUQUE violated Title 18, United States Code, Section 2199 (Stowaway on Aircraft) and that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __27th__ day of
April, 2022

_____
HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE